HARRIS TRUST & SAVINGS BANK, Trustee, Plaintiff-Appellee, *v.* WILLIAM L. DUGGAN, Commissioner, Department of Inspectional Services of the City of Chicago, *et al.*, Defendants-Appellants.—(322 WEST OAKDALE, INC., *et al.*, Petitioners-Appellants.)

First District (3rd Division)　Nos. 80-2126, 80-3079, 81-2271 cons.

Opinion filed March 17, 1982.—Rehearing denied May 3, 1982.

Stanley Garber, Corporation Counsel, of Chicago (Robert R. Retke and Phillip L. Bronstein, Assistant Corporation Counsel, of counsel), for appellants William L. Duggan and City of Chicago.

Raymond F. Simon and Joseph A. Spitalli, both of Chicago (Simon & Spitalli, of counsel), for other appellants.

Donald Page Moore, Richard J. Roddewig, and Nancy L. Kaszak, all of Chicago, for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

This is a consolidated appeal of three related trial court decisions concerning the Kellogg mansion complex in the 2900 block of North Lake Shore Drive in Chicago. The three actions were brought by the plaintiff bank, as trustee of the Helen L. Kellogg trust and owner of the subject property, against William L. Duggan, Commissioner of the Chicago Department of Inspectional Services, and the city of Chicago. Plaintiff first sought a writ of *mandamus* compelling the city to issue demolition permits for the subject property and later challenged the validity of a zoning ordinance and a landmark ordinance as they applied to that property. The trial court found in favor of plaintiff in all three actions and entered judgment against defendants for $1,037,849.76 pursuant to section 5 of the Mandamus Act (Ill. Rev. Stat. 1979, ch. 87, par. 5) for defendants' wrongful failure to issue the permits. The city subsequently entered an agreement with plaintiff by which it relinquished its right to appeal and promised to issue the demolition permits in exchange for abandonment of its money judgment. After learning of the agreement, petitioners 332 West Oakdale, Inc., Martin J. Oberman and Hedwig Braun sought leave to

intervene after judgment in the final action. The trial court denied intervention, and on appeal petitioners seek review of all three decisions arguing that none of plaintiff's complaints stated a claim upon which relief could be granted. Plaintiff denies this contention. While agreeing that petitioners have standing to challenge the zoning decision, plaintiff maintains that they have no standing to challenge the landmark and *mandamus* decisions.

The property involved consists of three contiguous parcels of real estate located at 2946, 2952, and 2960 North Lake Shore Drive. The parcels are improved with three single-family residences which plaintiff acquired by deed from Mrs. Kellogg in 1972. At that time the property was zoned R8 and had been zoned R8 since 1961. The Kellogg family had resided in two of the homes. The third was acquired in 1971 for investment purposes. Upon the death of Mrs. Kellogg in 1978 plaintiff's purpose was to liquidate the assets and distribute the residue to a charitable foundation which she had created in her lifetime. Pursuant to this purpose, plaintiff contracted to sell the property for $2,639,325. The contract was subject to the R8 zoning which existed at that time. On February 1, 1979, plaintiff applied to the city for demolition permits. The permits were issued on March 6, 1979, but were revoked on the following day. The city explained in its letter of revocation that the buildings were "located in an area now under consideration by the Commission on Chicago Historical and Architectural Landmarks for designation as a Chicago Landmark District."

On April 6, 1979, plaintiff filed suit seeking a writ of *mandamus* compelling reissuance of the permits. During the pendency of the *mandamus* action however, the city, on August 10, 1979, enacted an ordinance which downzoned the property from R8 to R5, thereby precluding use of the subject property for purposes permitted under R8 zoning. As a result, the contract for sale was not effectuated. On October 22, 1979, plaintiff filed another action against the city seeking a declaratory judgment that the amendatory ordinance changing the zoning from R8 to R5 was unconstitutional and void. Oakdale, the owner of contiguous real estate, was granted leave to intervene as a party defendant. On June 25, 1980, the trial court entered a judgment in the zoning case declaring that the change in zoning from R8 to R5 was unconstitutional and void as it applied to the subject property and ordering that the subject property was lawfully usable for any purpose permitted under R8 zoning. On October 28, 1980, the trial court entered judgment for the plaintiff in the earlier action and ordered the issuance of a writ of *mandamus* ordering the city to reissue the demolition permits. In the meantime, however, the Commission on Chicago Historical and Architectural Landmarks had notified plaintiff of a hearing regarding the contemplated designation of

the subject property as historical landmarks. The commission subsequently recommended to the city council that the property be so designated. Consequently, the court in the *mandamus* action initially stayed the execution of the writ for 45 days to allow the city council time to consider the question of landmark status. The writ was later stayed pending appeal.

On February 11, 1981, the city council enacted an ordinance designating the subject property as a landmark. On March 31, 1981, plaintiff notified the commission of its continued desire to demolish the buildings and demanded that the city either allow demolition or acquire the property under eminent domain. Plaintiff further advised the commission that it waived its right to a hearing, and it requested that the commission proceed with the administrative procedures required under section 21—64.1 of the Municipal Code of Chicago. On April 21, 1981, plaintiff was advised by the city that its demands had been rejected and that the city denied it had any obligation to compensate plaintiff for the alleged taking. On May 15, 1981, plaintiff added a third count to its *mandamus* complaint alleging that the cumulative effect of defendants' actions in revoking the demolition permit, downzoning the property, and finally in designating the property as a landmark operated to deprive plaintiff of all reasonable use of its property for more than two years. Plaintiff alleged that defendants' actions thus resulted in its property being taken without due process and without payment of just compensation. On September 1, 1981, plaintiff amended its prayer for relief to conform to the evidence by adding a request for the entry of a declaration that the ordinance designating the subject property as a landmark was unconstitutional and void.

On September 2, 1981, the court entered judgment for plaintiff finding that the enactment by the city of its ordinance declaring plaintiff's property as "Chicago Landmarks" coupled with the city's refusal to issue demolition permits for the Kellogg mansions operated to deprive plaintiff of all reasonable use of its property thereby constituting a taking for public use for which plaintiff was entitled to just compensation. The court determined that $3,650,000 would be just compensation. Finding that the city was unwilling to compensate plaintiff, the court, rather than entering a judgment for money, entered a declaratory judgment declaring the ordinance designating the property as a historical landmark to be unconstitutional and void as applied to the subject property. In addition, the court awarded plaintiff $1,037,849.76 in damages under section 5 of the Mandamus Act.

Thereafter, the city entered an agreement with plaintiff by which the city relinquished its right to appeal all three actions and promised to issue the demolition permits in exchange for plaintiff's abandonment of its

money judgment. On September 14, 1981, petitioners sought to intervene post-judgment in the landmark case. The petition was denied. Petitioners appeal from that denial and from all three decisions.

We first address petitioners' contention that the trial court erred in denying their petition for leave to intervene in the landmark case. The question of when a third party may intervene is governed by section 26.1 of the Civil Practice Act. (Ill. Rev. Stat. 1979, ch. 110, par. 26.1.) Section 26.1 is to be construed liberally. (*Bredberg v. City of Wheaton* (1962), 24 Ill. 2d 612, 182 N.E.2d 742.) Its purpose is to avoid relitigation of issues in a second suit which are being litigated in a pending action. (*Caterpillar Tractor Co. v. Lenckos* (1981), 84 Ill. 2d 102, 417 N.E.2d 1343.) Intervention is proper, however, only where the intervenor stands to gain or lose by the direct legal operation and effect of a judgment in the suit. *In re Appointment of Special State's Attorneys* (1976), 42 Ill. App. 3d 176, 356 N.E.2d 195.

Oakdale is an association of the approximately 53 individual members who reside in apartments in the Oakdale building, the lot line of which is 18 feet from the subject property. Oakdale alleges that judgment for the plaintiff and the "consequent demolition of the Kellogg mansions will adversely affect the character of their neighborhood, remove an appealing and aesthetically attractive group of landmark structures, result in the construction of a new and much larger residential building which will increase traffic, congestion, and crowding in the neighborhood" and substantially reduce the value of the Oakdale property. Plaintiff, however, is not seeking permission in the landmark case for the construction of such a building. Plaintiff seeks such relief in the zoning case, and it does not contest Oakdale's right to intervene in that action. In the landmark case plaintiff merely seeks the invalidation of an ordinance which forbids the demolition of the existing structures. Oakdale does not allege, nor can we assume, that the demolition of the mansions will in itself decrease the value of the Oakdale property.

■■ Oakdale also alleges that the issuance of a demolition permit would cause it immense and irreparable loss "by destroying the Kellogg mansions' unique contribution to the cultural heritage and history of the City of Chicago." It fails, however, to assert that it or any of its members derive any personal benefit from the preservation of the buildings. Although the potential harm alleged need not be economic in nature, it must be individualized. (*Sierra Club v. Morton* (1971), 405 U.S. 727, 31 L. Ed. 2d 636, 92 S. Ct. 1361.) While the interest which an intervenor has in the pending suit need not be direct, it must be greater than that of the general public. (*Seger v. County of Du Page* (1978), 58 Ill. App. 3d 858, 374 N.E.2d 1099.) Oakdale fails to assert such an interest.

Oakdale's reliance on *Standard Bank & Trust Co. v. Village of Oak Lawn* (1978), 61 Ill. App. 3d 174, 377 N.E.2d 1152, is misplaced. In that case a plaintiff property developer sought to require a village to approve a site plan for the development of a shopping center. After plaintiff prevailed and the village voted not to appeal, neighborhood property owners sought to intervene. Unlike the present case, intervenors were able to allege that as a direct result of the judgment a shopping center would be erected near their property which would have an adverse effect on their property values. The primary issue in *Standard Bank* was the timeliness of the intervention, an issue we need not reach in the present case since we find that Oakdale does not have a sufficient interest in either the mandamus or the landmark case to warrant intervention.

Similarly, petitioner Oberman fails to assert a personal interest in the outcome of this suit to warrant intervention in the mandamus or landmark cases. He is alderman of the ward in which the property is located. His status as an alderman alone does nothing to enhance his right to intervene. (*University Square, Ltd. v. City of Chicago* (1979), 73 Ill. App. 3d 872, 392 N.E.2d 136.) Alderman Oberman asserts, however, that he was deprived by the actions of the parties and the trial court of the opportunity to exercise his legally delegated aldermanic responsibility under chapter 21, sections 21.62-21.64 of the Municipal Code to hear appeals from the denial of demolition permits for designated Chicago landmarks and to decide whether or not compensation should be paid.

Section 21—64.1 provides that when the building department receives an application to demolish a building previously designated as a landmark it must forward that application to the commission. It further provides that the application and relevant recommendations be subsequently forwarded, in accordance with a timetable specified in the ordinance, to the finance committee of the city council and finally to the council itself. The city council has the ultimate responsibility for rendering a decision. Alderman Oberman complains that the defendants violated the provision of the ordinance by failing to forward the application to the commission. He argues that the commission, the finance committee, and the city council were thereby deprived of an opportunity to review the matter and to consider ways and means available to preserve the landmark. He asserts that he was individually deprived as a member of both the finance committee and the city council.

Plaintiff, however, eliminated the initial step of this administrative process when on March 31, 1981, it wrote directly to the commission of its continued desire to demolish the buildings. Plaintiff also waived its right to informal conference and a hearing in this letter and requested the commission to proceed with the administrative process of forwarding the matter to the finance committee and city council in accord with the

ordinance. Therefore, the commission did receive the application. Whether or not the finance committee and city council ever considered the matter is not apparent from the record. It is apparent, however, that the city council was aware of the situation. In a letter dated October 28, 1980, when the landmark ordinance was still under consideration, plaintiff advised Alderman Stone that it would not consent to any landmark designation absent adequate compensation from the city. Furthermore, plaintiff was advised by an attorney for the city on April 21, 1981, that its demands had been rejected.

■■ Even if the city did somehow bypass both the finance committee and the city council when it denied the application, however, Alderman Oberman has not necessarily been foreclosed from exercising his aldermanic prerogatives in this matter. The judgment here merely held the ordinance unconstitutional as applied to the subject property because the city refused to compensate plaintiff. In denying the request to intervene, that court expressed the wish that the "City's administration and legislative officials would do their duty and pay the plaintiffs just compensation" so as to "preserve the buildings * * * for the people of Chicago." Therefore, a legislative solution may yet be available. Since Alderman Oberman has not shown that he will be affected by *mandamus* or landmark judgments he has not established a right to intervene.

Alderman Oberman also maintains that defendants further deprived him of the opportunity of exercising his legally delegated responsibility under chapter 6—8 of the code to consider and pass upon settlement agreements entered into by the city's legal representatives. The validity of the agreement referred to, however, was a post-judgment matter and is not properly an issue before this court.

Hedwig Braun's right to intervene was based upon her status as a paid-up tenant on the subject property until December 31, 1981. Since she no longer has an interest which could be affected adversely by the judgment, we need not consider whether she had a right to intervene at the time the petition was filed. (*Spencer v. Community Hospital* (1975), 30 Ill. App. 3d 285, 332 N.E.2d 525.) The issue is now moot.

We next address Oakdale's appeal from judgment for plaintiff in the zoning case. Its petition to intervene in that action was granted by the trial court, and its right to intervene is not contested by plaintiff.

The subject property, which faces Lincoln Park and Lake Michigan in the 2900 block of Lake Shore Drive, contains three mansions. In 1961 a comprehensive study of the area was done on behalf of the city. The conclusion of that study was that the properties fronting Lake Shore Drive in a six-block area from Belmont on the North to Diversey on the south, including the subject property, should be zoned R8. This determination was in accord with a city policy of having higher density and more people

adjacent to the lakefront. Subsequently this six-block area contained six high-rises and a hospital all of which were developed to the limits of the R8 classification. In addition there was a convent on the subject property, neither of which were so developed and both of which conformed to R5. Sheridan Road is immediately west, and all the property on both sides of Sheridan Road in that area was zoned R7. The interior of those blocks between Sheridan Road and Lake Shore Drive contained a mixture of R5 and R7 zoning.

The zoning amendment of August 10, 1979, rezoned only the subject property from R8 to R5. Essentially R8 allows a higher density, thus permitting a greater number of dwelling units than R5. The amendment precluded plaintiff from closing on its previously executed sales contract which was subject to the R8 classification.

■■ Initially we consider Oakdale's contention that the case should have been dismissed for plaintiff's failure to exhaust its administrative remedies. Specifically, Oakdale asserts that plaintiff neither alleged nor proved that it either protested the enactment of the ordinance or petitioned the city council for a rezoning to R8 once the ordinance had been passed. While plaintiff insists that it did object to the ordinance, we do not believe that exhaustion of administrative remedies was necessary under the present circumstances. Although courts have generally required strict compliance with the exhaustion rule, an exception has been recognized where, as in the present case, an ordinance is attacked as unconstitutional in its entirety. *Northwestern University v. City of Evanston* (1978), 74 Ill. 2d 80, 383 N.E.2d 964; *Bright v. City of Evanston* (1956), 10 Ill. 2d 178, 139 N.E.2d 270.

We next consider Oakdale's argument that plaintiff failed to state a cause of action because it did not allege facts pertaining to a proposed use of the subject property. Essentially plaintiff alleged that the downzoning from R8 to R5 had frustrated its plan to acquire an assemblage of real estate and then sell it for development in accordance with the then existing R8 zoning classification. Plaintiff thus alleged that the amendatory zoning amendment had imposed upon it an unconscionable hardship and was unconstitutional in that it was arbitrary, discriminatory and confiscatory and bore no reasonable relationship to the public welfare. Plaintiff did not, however, specify the exact use to which the property would be put if it were sold. Citing *Sinclair Pipe Line Co. v. Village of Richton Park* (1960), 19 Ill. 2d 370, 167 N.E.2d 406, Oakdale maintains that the trial court had no authority to declare the subject property suitable for any use permitted under the R8 classification. Oakdale urges that a court is authorized to set aside a zoning ordinance only to the extent necessary to permit a specified use proposed by plaintiff and that plaintiff's failure to propose such a use in the present case was fatal to its

cause of action. Furthermore, Oakdale asserts that the court's declaration will bar the city from ever rezoning the property and exempt the owner from compliance with the Lake Michigan and Chicago Lakefront Protection Ordinance.

Oakdale correctly asserts that courts have no authority to rezone property from one classification to another. That is a legislative function. (*Reeve v. Village of Glenview* (1963), 29 Ill. 2d 611, 195 N.E.2d 188; *La Salle National Bank v. City of Chicago* (1970), 130 Ill. App. 2d 457, 264 N.E.2d 799.) Courts are, however, authorized to pass upon the validity of an existing zoning ordinance, whether or not plaintiff has proposed a specific use. *Treadway v. City of Rockford* (1963), 28 Ill. 2d 370, 192 N.E.2d 351; *Forestview Homeowners Association, Inc. v. County of Cook* (1974), 18 Ill. App. 3d 230, 309 N.E.2d 763.

■■ Oakdale's reliance on *Richton Park* is misplaced. In that case the plaintiff landowner sought to make specific improvements to his property which were not allowed under the existing zoning ordinance. Unlike the present case, invalidation of the existing ordinance would have left the property completely unzoned. Recognizing the undesirability of this result, the court held that where a specific use is proposed the trial court may frame relief in such a way as to guarantee that the owner will be able to proceed with that use without further litigation. The court did not hold the assertion of a proposed use to be an essential allegation to a cause of action challenging a zoning ordinance. Here invalidation of the amendatory ordinance which changed the zoning classification from R8 to R5 did not leave the property unzoned. Rather, the property remained subject to its prior R8 classification. (*Treadway v. City of Rockford* (1962), 24 Ill. 2d 488, 182 N.E.2d 219.) This reversion to R8 would have occurred even absent the court's declaration that the subject property may be "lawfully usable for any use permitted under the R8 General Residence District Zoning." This declaration does not, therefore, constitute judicial rezoning but rather a statement of the necessary consequences of the court's having declared the zoning amendment invalid.

We next address Oakdale's argument that plaintiff failed to establish that the amendatory ordinance was invalid in its application to the subject property and that the trial court erred in finding that the amendment constituted an unconstitutional taking.

The following pertinent testimony was adduced at trial. Rolf Campbell, a city planner and zoning consultant, testified for plaintiff and acknowledged the variety of lower zoning classifications west of the subject property. Although more than one classification in a given block could be compatible with good zoning, he opined that, in the subject area, the R5 classification should be limited to the interior of the block and extend neither to Lake Shore Drive nor Sheridan Road. He asserted that

the highest and best use of the subject property, due to its lake-front location, was for a high-rise multi-family building in accord with the R8 zoning classification. Campbell stated further that such use would have no adverse effect on the health, safety and welfare of the surrounding area. He stated that the 1979 amendment which downzoned only the subject property was neither comprehensive in nature nor consistent with the trend of development in the area.

Terrance O'Brien, a real estate appraiser, testified for plaintiff and agreed with Campbell as to the highest and best use of the property. He also stated that there would be no adverse impact on the value of the surrounding property if the subject property were developed to R8 density. He estimated the value of the subject property to be $3,200,000 if zoned R8 and only $1,780,000 if zoned R5.

Martin Murphy, acting commissioner of the department of planning of the city, was called as an adverse witness by plaintiff. He admitted testifying before the building and zoning committee in opposition to the proposed 1979 amendment. At that time he thought that it was out of character with the underlying zoning which had been established in the area since 1961. He thought the amendment lacked consistency in that it was not the result of a comprehensive study of a large area. Murphy withdrew his objection when he was informed that the alderman who had introduced the amendment planned to introduce another amendment to downzone the neighboring convent to R5.

Jerry Jacobson, deputy commissioner of zoning, testified for defendants that the 1979 amendment resulted from a decision by the city, in response to community and aldermanic concern, to downzone various parcels of property within the area in order to reduce density. Rather than adopt a comprehensive zoning amendment, the city downzoned parcels in a piecemeal fashion. The only properties downzoned were those not yet developed to the maximum density permitted by the existing ordinance. Left intact were parcels already developed to the maximum use allowed. Jacobson estimated that nearly 90% of the land in the area had been downzoned in this piecemeal fashion. Stating that his definition of highest and best use was "one that best serves the needs of the community, and the City itself," he gave his opinion that the highest and best use of the subject property was R5.

John McNamara, a real estate appraiser, testified for defendants that limiting the density of the subject property to R5 would benefit the surrounding area in that it would allow greater light than would an R8 development. He estimated the value of the subject property under R8 classification to be $3,050,000 while under R5 it would be worth only $1,800,000. He believed, however, that it could be economically developed under R5. McNamara stated further that the highest return to

plaintiff would be under an R8 zoning and he defined highest and best use as "the use to which the property can be put over a period of time, with the greatest amount of monetary return to the owners." But he insisted that R5 would be a better and higher use than R8, and he stated that the highest and best use was as a Kellogg mansion.

Where a zoning ordinance is challenged, a presumption always attaches to its validity. (*Jacobson v. City of Evanston* (1956), 10 Ill. 2d 61, 139 N.E.2d 205.) The party challenging the ordinance has the burden of proving by clear and convincing evidence that the application of the ordinance is arbitrary and unreasonable and constitutes a hardship to him which is not justified by any benefit to the public health, safety and welfare. (*Exchange National Bank v. County of Cook* (1962), 25 Ill. 2d 434, 185 N.E.2d 250.) Factors to be considered include the existing uses and zoning of nearby property, the extent to which property values are affected by the particular classification, the promotion of the public welfare, the relative gain to the public as compared to the hardship imposed on the property owner, and the suitability of the property for the purpose zoned. *Chicago Title & Trust Co. v. Village of Wilmette* (1963), 27 Ill. 2d 116, 188 N.E.2d 33; *Forestview Homeowners Association, Inc. v. County of Cook* (1974), 18 Ill. App. 3d 230, 309 N.E.2d 763.

■■ Also relevant to the validity of a zoning ordinance is the question of whether it was adopted pursuant to a comprehensive plan. The absence of such a plan, although not dispositive on the issue of validity (*First National Bank v. Village of Vernon Hills* (1977), 55 Ill. App. 3d 985, 371 N.E.2d 659), weakens substantially the presumption of validity which normally attaches to a zoning ordinance, especially after years of original zoning on which interested persons have come to depend. (*Forestview Homeowners Association, Inc. v. County of Cook.*) The fact that, as here, a single parcel was rezoned does not absolutely negate the existence of a comprehensive plan. (*Goffinet v. County of Christian* (1976), 65 Ill. 2d 40, 357 N.E.2d 442.) Testimony here differed on whether the 1979 amendment was enacted pursuant to a comprehensive plan. In such instance, the findings of the trial court will not be disturbed unless against the manifest weight of the evidence. (*La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 145 N.E.2d 65.) The trial court found that the city had decided to reduce the zoning on various pieces of property in the area on a piecemeal basis, for the purpose of decreasing density. The court found that the method used benefited owners of existing high rise buildings by placing all the burden on those landowners, including plaintiff, who had not yet developed their properties to the maximum density allowed. The court found this arrangement to be a taking.

■■ This approach by the city, however, is not unreasonable in itself so long as the benefit to the public outweighs the harm to the landowner.

(*Amdur v. City of Chicago* (7th Cir. 1981), 638 F.2d 37.) In any event, the trial court found that the hardship to plaintiff was not justified by any benefit to the public. The downzoning not only precluded plaintiff from a sale of the land but it also substantially reduced the value of its property. While diminution in value alone does not suffice to invalidate an ordinance, it must be shown that the public welfare does not require the restrictions and resulting loss. (*Zenith Radio Corp. v. Village of Mount Prospect* (1973), 15 Ill. App. 3d 587, 304 N.E.2d 754.) Testimony as to public benefit was contradictory in the present case. Evidence offered by plaintiff demonstrated that the policy of encouraging R8 development on lake-front property benefited the public. Defendants' evidence revealed that lower density would benefit plaintiff's neighbors. The trial court's determination that the hardship to plaintiff outweighed benefit to the public was not manifestly against the weight of the evidence.

For the reasons stated, the orders of the circuit court of Cook County denying petitioners leave to intervene in the landmark and mandamus cases are affirmed. The judgment finding the downzoning from R8 to R5 unconstitutional and void as applied to this property is also affirmed.

Judgments affirmed.

WHITE, P. J., and RIZZI, J., concur.